Parker, C. J.,
delivered the opinion of the Court.
We do not find that there is any legal objection to the admission of the copy of the mortgage deed in evidence, even if the exception had been taken at the trial. The original was not in the possession of the party producing the copy, nor had he any control over it. The execution of such a deed was not denied, and the question of title to the estate it purported to convey was not in issue. It was produced to prove a collateral fact, viz., that properly had been conveyed to Scammel Penniman, as a security or indemnity for debts or liabilities on account of his brother Silas Penniman. The fact of such a conveyance was not denied; and it might have been proved prima facie by parole, for the purpose for which the copy was used at the trial. *134 [ * 166 ] * As to the admission of the declarations of Silas Penniman, to contradict his testimony in his deposition, it would be running counter to the uniform practice in this Court, ever since its practice can be remembered, to have rejected, that evidence. The credit of a witness may be impeached by showing that he has made a different statement out of court, either before or after he has given his testimony. Nothing is more common than to have evidence of the conversations of a witness, tending to contradict his testimony upon the stand. It is every day’s practice. If the principal witness is present, he is called upon to attend; and he then has an opportunity to explain or deny. If he denies, then the credibility of the opposing testimony is to be decided by the jury. No lawyer in this commonwealth can, I think, recollect an instance of an impeaching witness being stopped, until the other was called up and asked whether he had had any conversation with the person about to impeach him, and was reminded of that conversation.
The practice adopted in the British House of Lords, on the trial of the Queen, has never been adopted in this country, and seems not to have been very familiar there; otherwise it would hardly have seemed necessary to have taken the solemn opinion of all the judges of the Court of King’s Bench upon the question.
Indeed, the utility of such a practice is not very obvious (2). Witnesses about to be impeached are generally persons of a doubtful or unknown character; and the wisdom of putting them upon their guard, and enabling them to forestall an answer to the opposing witness, is not very discernible. Phillips lays down no such rule of evidence: on the contrary, he expressly states that a witness may be impeached, by proving that he has given a different account of the thing; and a letter written by him to this effect may be used against his testimony, and this without asking him upon the stand whether he had written such a letter, or what were the [ * 167 ] contents of it. * Peake states that declarations made by a witness on the same subject, contrary to what he swears on the trial, may be given in evidence to impeach his credit; and no qualification of this doctrine is laid down (3).
It has been suggested that, admitting such evidence proper to impeach a witness, who is upon the stand, it ought not to be allowed to impeach a deposition, the witness being absent, and having no opportunity to deny or explain. The witness who has testified upon the stand hears, it is true, the evidence which tends *135 to impeach him, or he may be called back for that purpose, if he be absent: so where the evidence goes to affect the credibility of a deposition, if it be material, the Court would give time for the principal witness to appear, or for other depositions to be taken, relative to the facts which are proved to impeach him. It may sometimes be inconvenient; but if justice requires delay, it would be given. Suppose a witness, who has once testified, should afterwards acknowledge the falsity of his statements, and then die; the party interested in his testimony might, upon another trial, prove what he had once said upon the stand under oath; and shall not the other party be permitted to prove that what he said was a falsehood ?
Whatever may be the reasons for adopting the practice in England, of first advertising the witness on what grounds he is about to be impeached, we are satisfied that such practice has never prevailed here; and we see no reason for introducing a rule altogether unknown to the practitioners in this country. In England it is rather a matter of practice than a rule of evidence, as would seem by the opinion of the judges in the Queen’s trial. It may date its origin long since we were bound by English laws, and if so, would have no force here, except by adoption (4).
There being no ground of objection to the verdict, on account of the admission of incompetent evidence, it remains to be inquired whether there is any other cause for setting it aside.
* The charge does not seem to be directly found fault [ * 168 ] with, and yet it seems not to have been entirely satisfactory to the defendant’s counsel. The jury were instructed that, if they believed from the evidence that the plaintiff had no knowledge of any assignment of the policy, when he received the order, and that the defendant did know of it, but did not communicate his knowledge; having accepted the order unconditionally, he was bound by his acceptance.
We are all satisfied that this instruction cannot be complained of by the defendant, the principle involved in it being as favorable for him as the case would admit of.
The direction goes upon the supposition that the plaintiff, having *136 a fair demand against Silas Penniman, who was insolvent, but who had funds in the hands of the defendant, received an order upon him for a portion of those funds, in satisfaction of his demands, as far as the proceeds would go; and that the defendant, without any restriction in writing or otherwise, accepted the order thus drawn. The inference, which naturally presented itself to the jury, must have been, that the funds were free from any prior lien; for a general acceptance could not have been given under such circumstances, without a fraudulent intent to conceal the lien, which is not to be imagined.
Upon this part of the charge, the turning point with the jury was, whether the plaintiff knew or was informed of the assignment of the policy: and here the evidence was positive in favor of the defendant, if the testimony of Silas Penniman was accredited But there were circumstances in the case which led the jury to doubt; particularly, that such knowledge in the plaintiff did not correspond with the conduct of the parties in drawing and receiving the order, and the conversation of Penniman in presence of the witness Brooks undoubtedly tended to increase those doubts; so that the jury finally disbelieved Silas P. [ * 169 ] * It is said the verdict is against evidence, for that the witness ought to have been believed. But the credit of witnesses lies entirely with the jury, when there are any facts or testimony in the case tending to impeach them. We cannot say that the verdict is against evidence; so that there cannot be a new trial.

Judgment on the verdict.

 [The practice is obviously very convenient and useful.—Ed.]

 Peake's Law of Evidence, 89.

 [It is a general rule of the English law, that wherever the credit of a witness is to be impeached by proof of any thing that he has said, or declared, or done, in relation to the cause, he is first to be asked, upon cross examination, whether he has said, or declared, or done, that which is intended to be proved. If the witness admit the words, declaration, or act, proof on the other side becomes unnecessary, and an opportunity is afforded to the witness of giving such reasons, explanations, or exculpations of his conduct, if any there be, as the circumstances may furnish, and thus the whole matter is brought before the Court, which is the most convenient and reasonable course.—1 Starhie, Evid. 183, 2d English edition.—Queen's case, 2 B. -fy* S. 300, 313.—Augus vs. Smith, 1 Mood. & Malk. 474.—En.]