Downer et al. *v.* Dana et al.

---

SOLOMON DOWNER AND RANDOLPH WASHBURN *v.* HORACE DANA AND ELIHU NORTON.

It is an established rule of practice in this state, that testimony as to the pre- vious declarations of a witness produced upon the stand, offered for the purpose of impeaching him, cannot be received, unless an opportunity be first afforded to the witness, whose testimony it is proposed to impeach, to explain or qualify the imputed declarations;—and in this respect this court have fully sanctioned the English rule, which proceeds so far, as to admit of no exception, even in cases where, when the cross examination was closed, the party wishing to impeach had no knowledge of the variant de- clarations or inconsistent conduct of the witness, and the witness has de- parted from court and cannot be recalled.

But this rule has no proper application to testimony in the form of depositions, whether taken with or without notice, and whether the adverse party at- tended at the taking, or not ; but the party may, in such case, without pre- vious inquiry, prove any inconsistent declarations or conduct of the witness.

Where the deposition of a witness is used by one party upon the trial, a dep- osition of the same witness, taken by the other party, but which is inad- missible, as such, by reason of a defect in the caption, may yet be received, as a declaration of the witness, for the purpose of impeaching the testimony contained in the former deposition. *Semb.*

Downer et al. *v.* Dana et al.

Under the plea of *non est factum*, in an action of debt upon a jail bond, the defendants may avail themselves of any ground of defence, showing that there never was any legal validity to the bond.

If the jail limits, in a county, are capable of being ascertained by a resort to the records of the county court, as is ordinarily the case, then such resort must be had ; if not, proof of general understanding and acquiescence of all concerned, for thirty years, and probably for fifteen years, in certain recognized and well defined boundaries is equivalent to record proof.

In this case the county court charged the jury, that if certain territory had been, for thirty years, regarded by the community, and adopted and acquiesced in by all who had any interest in learning the extent of the jail limits, as being a part of the jail limits, and the fact of its being part of the jail limits had never, during that time, been questioned or disputed, although it did not appear to have been established by the court, in pursuance of the statute, it would now be regarded as within the jail limits, and a prisoner's going upon that territory would not be a breach of his jail bond ; and it was held, that there was no error in the charge.

Where it appeared, that the jail limits were regularly laid out and established by the county court, and some rods exterior to one of the lines a tree stood, marked plainly with the letters G. L., indicating that it was on the line of the gaol limits, but it did not appear by whom or when the tree was thus marked, although it was less than thirty years, but more than fifteen years, before the alleged escape, and it appeared, that, from the time it was so marked, the prisoners upon the limits had been accustomed to go to that tree, and treat it as one corner of the gaol limits, the going to this tree, by a prisoner on the limits, was held, by a majority of the court, not to be a breach of his jail bond. *Prince v. Burnham et al.,* Chittenden Co., 1832, cited by DAVIS, J.

DEBT upon a jail bond. Plea, *non est factum*, with notice of special matter of defence, and trial by jury, March Term, 1845,—HEBARD, J., presiding.

On trial it appeared that the defendant Dana had heretofore been committed to the common jail in Orange county upon execution in favor of the plaintiffs, and that the bond in suit was executed, in common form, upon his being admitted to the liberties of the prison ; and the plaintiffs gave in evidence a transcript from the records of Orange county court, by which it appeared, that that court, at their December Term, 1813, appointed a committee " to survey and lay out the gaol yard in said county, in such manner as that it shall contain four square miles," in such form as the committee might

think proper; that the committee, on the twenty first day of December, 1813, and during the same term of the court, made a report, accompanied by a plan, laying out the jail limits in a square form; that on the twenty second day of the same December, and before the report was accepted, an alteration of the jail limits was proposed and surveyed, and was marked upon the plan, but not incorporated into the report of the committee, by which a small piece of land was added to the jail limits, near the south west corner of the limits as first surveyed, and an equal quantity was taken from the first survey, at the south west corner;—and the record showed an acceptance of the report by the court, during the same term, in these words,—" *Report accepted by the court as first laid out until June Term next.*" It was conceded, that no other record, or written proceedings, as to said limits, exist, or can be shown to have existed.

The plaintiffs also gave in evidence the deposition of one Smith, taken *ex parte*, and the deposition of one Rutter, taken with notice to the defendants, but at the taking of which the defendants did not attend,—which depositions tended to prove a breach of the condition of the bond declared upon. The plaintiffs also introduced other evidence, tending to prove that Dana, after his commitment, and after the execution of the bond in suit, had been to a house in Chelsea, called the Douglass house, which was without the limits of the first survey made by the committee, as above mentioned.

The defendants then offered parol evidence, tending to prove that the additional piece of land, included in the survey of the proposed alteration of the jail limits as first surveyed, had, for about thirty years, been taken by the people of the vicinity to be a part of the jail yard, and that the prisoners admitted to the liberties of the jail had, during that time, been accustomed to go there, and that the Douglass house was upon that additional piece. To this evidence the plaintiffs objected,—but it was admitted by the court.

The defendants also offered in evidence a deposition of said Smith, which was objected to by the plaintiffs for insufficiency of the caption and was excluded by the court; but its signature by Smith and the administration of the oath to him by the justice being proved, it was again offered in evidence for the purpose of impeaching Smith. To this, also, the plaintiffs objected; but the objection was

overruled by the court. The defendants also, for the purpose of impeaching the witness Rutter, offered to prove declarations made by him previous to the giving of the deposition used in the case by the plaintiffs, but in reference to which no preliminary inquiry had been made of him. To this the plaintiffs objected ; but the evidence was admitted by the court.

The plaintiffs requested the court to charge the jury, that the proceedings of the county court of Orange county fixed the limits of the jail yard as first surveyed, and that, if Dana went without those limits, they should return a verdict for the plaintiffs.

But the court charged the jury, that, if the additional piece of land, designated upon the plan, has been for thirty years regarded by the community, and adopted and acquiesced in during all that time, by all who had any interest in learning the extent of the jail limits, as being part of the jail limits, and the fact of its being a part of the jail limits has never, during that time, been questioned or disputed, although it does not appear to have been established by the court, it will now be regarded as within the jail limits, and that Dana's going upon that additional piece would not be a breach of his jail bond.

Verdict for defendants. Exceptions by plaintiffs.

*Hunton* and *Tracy & Converse* for plaintiff's.

I. The court below erred in admitting the parol evidence offered by the defendants.

1. The liberties of the jail could only be set out in pursuance of the statute; Slade's St. 219, § 9; Ib. 234, No. 16; See Vermont State Papers 458–9. The offer was, to prove that from about 1813 the piece of land, which was surveyed as an alteration of the jail yard, had been regarded as a part of the jail yard ; and the case then shows conclusively how it came to be so ; and no presumption of law exists, or of fact could be made, to the contrary. *Jackson* v. *Wilkinson,* 3 B. & C. 413, [10 E. C. L. 135.] *Campbell* v. *Wilson,* 3 East 294, 301. *Smith* v. *Higbee,* 12 Vt. 113. *Hathaway* v. *Clark,* 5 Pick. 490. *Brunswick* v. *McKean,* 4 Greenl. 508. If it had appeared from the plaintiff's testimony, in the first instance, that the defendants were his tenants, as in the case of *Mitchell* v *Walker,* 2 Aik. 266, or if the defendants had offered to prove this,

they would not have been permitted to give in evidence their posses-
sion and use; it would have been entirely irrelevant; but no more so
than the evidence offered in the case at bar.  A presumption cannot
stand, if the contrary appear.  *Goodtitle ex d. Bridges et al. v. Duke
of Chandos,* 2 Burr. 1073.  In the case at bar the contrary did
clearly appear.

2  The plaintiffs never before had an interest, a right, or an oppor-
tunity, to object to the persons, who were admitted to the liberties
of the jail, going to the land included in the second survey; there-
fore no presumption ought to be made against them.  2 Burr. 1073.
*Daniel v. North,* 11 East 372.

3.  The evidence was not admissible as tending to show a pre-
scriptive right.  1.  It had no tendency to show that the defendants,
and those under whom they claimed, had immemorially used to en-
joy the privilege.  2 Bl. Com. 263.  3 T. R. 147.  5 Ib. 411.  2.
A prescription must always be laid in him that is tenant of the fee.
2 Bl. Com. 264.  3.  A prescription cannot be for a thing which
cannot be raised by grant; 2 Bl. Com. 265; it is founded upon a
grant; *Morewood v. Wood et al.,* 4 T. R. 161; which, where an
individual has enjoyed a right time out of mind, without being able
to trace the origin or foundation of it, will be presumed; *Clarkson
v. Woodhouse,* 5 T. R. 414, in note.  4.  What is to arise by mat-
ter of record cannot be prescribed for.  2 Bl. Com. 265.  *Mayor
of Hull v. Horner,* Cowp. 102.

4.  Nor was the evidence admissible, as tending to show dedica-
tion, as in case of highways.  In that case the public, by use, gain
a right against individuals, the owners of the land; in this case the
owners of the land have no right or interest in the matter, as owners,
and the plaintiffs could not have granted the right.  *Barker v. Rich-
ardson et al.,* 4 B. & Ald. 579, [6 E. C. L. 523.]  *Wood v. Veal,*
5 B. & Ald. 454, [7 E. C. L. 158.]  *Rughby Charity v. Merry-
weather,* 11 East 375, in note.

5.  Nor as showing a bar.  *Campbell v. Wilson,* 3 East 301.
*Oswald v. Leigh,* 1 T. R. 272.  *Mayor of Hull v. Horner,* Cowp.
102.  Lapse of time is an absolute bar, when made so by statute,—
Cowp. 108,—and pleaded.

II.  The court erred in not charging as requested.  The legal
effect of the record testimony was as the court were requested to

state it to the jury. All ground of presumption in favor of the defendants was taken away by the evidence. *Griffith* v. *Matthews*, 5 T. R. 296.

III. The court erred in their charge. The only ground for any pretence of claim, that the Douglass house was within the jail limits, is that the proper authority made it so. But the court instructed the jury, that they might find for the defendants; though that fact did not appear. That is a fact which the court cannot presume. *Goodtitle ex d. Jones* v. *Jones*, 7 T. R. 43. It belongs exclusively to the jury. *Gayetty* v. *Bethune*, 14 Mass. 49, 55. 2 Aik. 270. *Livett* v. *Wilson*, 3 Bing. 115, [11 E. C. L. 57 ] 12 Vt. 124. *Gray* v. *Gardner*, 3 Mass. 402. *Colman et al.* v. *Anderson*, 10 Mass. 105. *Roe ex d. Johnson et al.* v. *Ireland*, 11 East 280. *Dawson* v. *Duke of Norfolk*, 1 Price 246. *Eldridge* v. *Knott et al.*, Cowp. 214. *Wright* v. *Smythies*, 10 East 409. *Read* v. *Brookman*, 3 T. R. 159. *Powell* v. *Milbanke*, Cowp. 103, in note. *Sherwin* v. *Bugbee*, 16 Vt. 439. *Dillingham* v. *Snow et al*, 5 Mass. 547. *Univ. of Vt.* v. *Reynolds*, 3 Vt. 542, 558, 559. Mere possession, or use, gives no title whatever. *Goodtitle ex d. Parker* v. *Baldwin*, 11 East 488. 11 East 371. *Stocks* v. *Booth*, 1 T. R. 428. *Rogers* v. *Brooks et ux.*, Ib. 431, n. But this is not a proper case, in which to presume that the county court acted, unless the jury should be reasonably satisfied that such action has been had. *Doe ex d. Fenwick et al.* v. *Reed*, 5 B. & Ald. 232, [7 E. C. L. 79.] It is, in principle, like the case of *Daniel* v. *North*, 11 East 372.

IV. The court erred in admitting the evidence as to the witness Rutter. The deposition was taken with notice, and the defendants had an opportunity to inquire of the witness as to the conversation concerning which the evidence was given, but did not do so. *Queen's Case*, 2 B. & B. 300, [6 E. C. L. 122.] *Angus* v. *Smith*, 1 M. & M. 473, [22 E. C. L. 360.] 1 Stark. Ev. 145, 146.

*O. P. Chandler* and *L. B. Vilas* for defendants.

1. Parol evidence was properly admitted by the county court to show the limits of the jail yard by reputation and acquiescence. There is no record evidence of the existence of the jail yard since June Term, 1814, and the only way in which the limits could be shown was by parol. This court have held, that the organization

and limits of a school district may be proved by reputation. *Barnes* v. *Barnes,* 6 Vt. 388. *Sherwin* v. *Bugbee,* 16 Vt. 439. In the case of *Prince* v. *Burnham et al.,* decided in Chittenden county in 1831, (not reported,) we understand the very question now raised was distinctly presented and decided in conformity to the decision of the county court in the case at bar. In some of the neighboring states evidence of a similar character and for a similar purpose has been received and acted upon. *Clap* v. *Cofran,* 7 Mass. 98. *S. C.,* 10 Mass. 373. *Freeman* v. *Davis,* 7 Mass. 200. *Ballou* v. *Kipp,* 7 Johns. 175.

2. The testimony admitted to impeach the Deposition of Rutter was properly received. We recognize the rule contended for by the plaintiffs, when applied to witnesses in court; but in reference to depositions it is inapplicable. There can be no distinction between *ex parte* depositions and those taken with notice.

The opinion of the court was delivered by

DAVIS, J. The first question which arises is, whether the decision of the county court was right in admitting the defendant to shew the previous declarations of Rutter, with a view to impeach his deposition introduced by the plaintiff,—it appearing, that, at the time of taking the same, no person appeared on behalf of the defendants, although they had due notice, and that consequently the deponent was not interrogated in respect to such declarations.

It is indeed an established rule of practice in this state, that testimony of this kind cannot be received to impeach a witness produced upon the stand, unless an opportunity be first afforded to the witness, whose testimony it is proposed to impeach, to explain or qualify the imputed declarations. This rule is carried so far in England, as to admit of no exception, in cases where, when the cross examination was closed, the party wishing to impeach had no knowledge of the variant declarations, or inconsistent conduct, and the witness has departed from court and cannot be recalled. *Queen's Case,* in House of Lords, 2 Brod. & Bing. 212. This court have fully sanctioned the rule as existing in England. In Massachusetts it has never been adopted. *Tucker* v. *Welsh,* 17 Mass. 160. I infer, also, that it has never been adopted in New-Hampshire; *French* v. *Merrill,* 6 N. H. 465; nor in Connecticut; *Judson* v. *Blanchard,* 5 Conn. 557.

As observed by Ch. J. Parker, in *Tucker* v. *Welsh,* the rule seems to be of recent origin in England, as no mention is made of it by either Peake, or Phillips, in their treatises upon the law of evidence.    Starkie recognizes it in his text as settled law.    He is, I think, the first English writer that does so.    3 Stark. Ev. 1753–4. Ch. J. Parker says, it has never been adopted in this country. This remark was made as long ago as 1821.    At that time I think no lawyer in Vermont had heard of such a rule here ; and even now I do not find it naturalised any where, except here.    It is not adopted in Maine.    *Ware* v. *Ware,* 8 Greenl. 42.    Prof. Greenleaf, in his valuable treatise on evidence, [1 Greenl. Ev. 514,] adopts the English law in his text, without scruple, and in a note adds, that in this country the same course is understood generally to have been adopted, except in Maine, and *perhaps* Massachusetts.    I do not understand on what grounds the doubt in respect to the latter State is suggested.    In the case of *Tucker* v. *Welsh* it is distinctly and emphatically repudiated ; the Chief Justice giving his reasons for doing so at some length.    The case cited by the learned professor, as giving rise to the doubt,—*Brown* v. *Bellows,* 4 Pick. 188,— it seems to me, is not at all in conflict with the doctrine of *Tucker* v. *Welsh.*    The point involved and decided simply respected the extent, to which a party may go in contradicting his own witness. One Lord was called by the plaintiff, from necessity, to prove the execution of a paper, to which he was a subscribing witness.    On his cross examination he stated a fact adverse to the plaintiff's interest, in relation to his connection with the defendant.    The plaintiff was allowed to prove by Ormsby, that Lord had made statements at variance with his testimony on cross examination.    It is true, however, that, on trial, Lord was first interrogated as to those statements. The point in question, therefore, did not come at all before the supreme court.    No cases are cited from any of the American States, to sustain the sweeping remark alluded to in the note.

Were the question *res integra,* I confess I could see no advantages to the cause of truth and justice, from the adoption of this rule of evidence, which are not equally well secured by the old practice of allowing the party, whose witness has in that way been attacked, to recall him, if he chose, for the purpose of contradicting or explaining the conduct or declarations imputed to him.    Indeed I have seen no

44

objections of consequence to that course, except that it may some-
times happen, that the witness may have departed from court, suppos-
ing his attendance no longer necessary.  Such an objection, prac-
tically, is entitled to very little weight, as it would be provided
against by requiring, as is in fact generally done for other reasons,
witnesses to remain in court until the testimony is finished.  On
the other hand, this rule would be productive of intolerable mis-
chiefs, were it not mitigated by the somewhat awkward·and incon-
venient expedient of suspending the regular course of the testimony,
for the purpose of recalling the witness proposed to be impeached,
and laying a foundation for the impeaching testimony by interrogat-
ing him, whether he did or said the things proposed to be proved.
Besides, the privilege of doing this will be lost in all those cases,
where the witness has left court and cannot be found.  The oppo-
site party has every inducement to cut off this opportunity by im-
mediately discharging all such, as he may have reason to suspect
are liable to be impugned.  In addition to this, the avowed attempt
to produce self impeachment, made, of course, in a tone and manner
evincing distrust of the general narrative, too often both surprises
and disconcerts a modest witness.  He answers hastily and confus-
edly, as is natural from having such a collateral matter suddenly
spring upon him.  Every one, conversant with judicial proceedings,
must have often observed with pain an apparent contradiction, pro-
duced in this way, when he is satisfied none would have existed un-
der a different mode of proceeding.

Although to my mind these considerations present very formidable
objections to the practice first authoritatively developed on the trial
of the Queen in the House of Lords, yet I acquiesce in it as the
settled practice in this state.

It remains to be considered, whether it can be properly applied
in the case of depositions.

In the case of *Tucker* v. *Welsh,* already cited from Massachu-
setts, the court were urged to adopt the practice in respect to testi-
mony taken in that form, though they should not be disposed to do
so in other cases.  The court, however, could perceive no special
reasons in favor of such a discrimination.  We think there are sub-
stantial reasons why a discrimination should be made the other way.
The rule thus applied would impose on a party, wishing the privil-

Downer et al. v. Dana et al.

ege of impeachment, the necessity of attending in person, or by counsel, at the taking of every deposition to be used against him, within or without the state, which, on any other account, he might not be disposed to do. Besides, in many cases the deponent may be wholly unknown to him; he may have no knowledge of the matter to be testified to, until 'actually given; the notice of the taking may be barely sufficient to enable him to reach the place, perhaps hundreds of miles distant, in season to be present. It would be idle, under such circumstances, to expect a party to be prepared to go through with this preliminary ceremony. The result would be, he would be least able to shield himself against partial or false testimony, precisely when such protection is most needed. It is true, the deponent, being absent from the trial, hears not the impeaching testimony, and cannot be called upon to contradict or explain it. This may be an evil, but is unavoidable from the nature of the case. It would be a worse evil to deny the right of impeaching depositions, unless under regulations, which would reduce the right to a nullity.

We attach no importance to the circumstance, that the defendants, though notified, were not present at the taking of Rutter's deposition. Had they been present, the result would have been the same. In our opinion the rule adverted to has no proper application to testimony taken in the form of depositions. The impeaching testimony was therefore properly admitted.

The exception taken to the admission of the deposition of Smith, on the part of the defendants, is now abandoned.

A more important question, the principal one on which the case depends, remains to be considered; and that is, whether the county court were right in permitting evidence to go to the jury, the object and tendency of which was to shew a *de facto* establishment of jail limits in Chelsea, and in their instructions in reference to such testimony.

By an act of the legislature, passed in 1797, it was made the duty of the several county courts to set out jail yards in the respective counties, which, by a subsequent statute, passed in November 1813, are required to be limited to four square miles in extent. At their next term after the passage of this last statute, the county court of Orange county, in December, 1813, appointed a committee of four

persons to lay out and survey a jail yard for that county, in such form as they should think proper, but so as to contain four square miles,—who were required *to report during the then present term* of the court. This committee drew up in writing, and presented to the court, their report on the 21st of December, 1813, setting out the yard by metes and bounds in a square form, containing four square miles, accompanied by a map and plan of the same, constructed by John McDuffie, the surveyor employed by them. On the 22d of the same December the said surveyor presented the field minutes of an altered survey, entitled "Plan of jail yard alteration," which varies from the original survey by adding on, near the south west corner, a parallelogram-shaped piece, comprehending 6370 square rods, or nearly one sixteenth part of a square mile, and by cutting off from the original plan, a little farther west, at the corner, an equal quantity of land. What motive suggested the proposed alter-ation does not appear; probably some considerations of convenience, arising from the nature of the localities in that vicinity. This pro-posed alteration seems never to have been acted upon, or in any way noticed, by the committee; but was before the court, when the following order was made and entered upon the records. "Report accepted by the court *as first laid out* until June Term next." No farther action of the court at that or at any subsequent term appears to have been had; and the exceptions say, that it was conceded, that no other record or written proceedings exist, or can be shown to have existed.

There was evidence in the case showing that Dana, the principal in the bond, after commitment, and before any discharge, went to a house called the Douglass house, situated without the original sur-vey, but within the limits of the additional piece above referred to. This, with the other testimony in the case, tending to shew that the disputed territory had been recognized by the people of the vicinity, for about thirty years, as a part of the jail yard, that during that long period prisoners on the limits had been accustomed to go to that house, raises the question, whether any legal jail limits existed, which were transgressed by going thither. The propriety of its ad-mission is of course involved in the legal results deducible from it.

It is manifest, from the instructions requested on the part of the plaintiffs' counsel, that they suppose the limits originally indicated

by the committee and accepted by the court constitute the true and only jail limits established by law. If they are right in this, the testimony in regard to general acquiescence should not have been received, and the charge founded thereon was wrong. But it seems to me, upon the principles assumed by them, it is exceedingly difficult to came to the conclusion, that any jail limits whatever were established, which continued after June, 1814;—if so, neither the bond nor the assignment thereof could have any legal validity, and consequently this suit could not be sustained. Taking the record, alone, as our guide, and disregarding, as I think we should do, an objection interposed here by the defendants, that accepting the report alone cannot be considered as establishing the demarcation therein recommended, we find simply jail limits established provisionally until June term, 1814; after which they cease to exist as such.

Should it be urged, that it was not, by law, competent for the court to lay out and establish a yard for a limited period, the difficulty is not obviated; because, having no power to do what they attempted to do, their whole proceedings were a nullity. The only alternative, which offers an escape from this conclusion, is to be found in construing language, importing unequivocally a limited period, to mean perpetually. This we are not prepared to do.

The plaintiffs, then, in denying that any legal jail limits can be otherwise established than in the mode indicated by statute, have foreclosed all right to a recovery; for it cannot be doubted, that, under the plea of *non est factum*, the defendants may avail themselves of any ground of defence, showing that there never was any legal validity to the bond. They are thus forced to the necessity of falling back upon principles, which constitute the basis of the defence. The record equally fails both parties; and although the mode of considering the subject by them is different, and would lead to a different circumscription of the yard, it is not the less true, that both are under the necessity of abandoning the language of the record and resorting to reputation or usage. Perhaps the case might be properly left here, affirming the judgment upon the grounds above indicated.

As, however, the views taken by the court below, though not new in themselves, may be regarded as having a novel application, I pro-

ceed to announce the conclusion to which the court has come in reference to them.

This subject opens a wide field, and the cases having a bearing upon it are exceedingly numerous. From an examination of many of them we cannot fail to see, that the principle of dispensing with strict and exact proof, in the prescribed form, of every estate, interest, authority, easement, &c., is one of universal application in every branch of the law, municipal, or national. Any system of jurisprudence, which should discard it, would be intolerable. It is diversified and modified in a thousand ways, but can be traced everywhere. Under the name of prescription, limitations, presumption, estoppel, reputation, acquiescence, it is, in essence, the same thing. The only difficulty exists in making a proper application of it. No doubt it would be going too far, to say, that any power of discrimination, or amount of industry, could deduce from the chaos of decisions a clear, rational and intelligible system, accommodated to the varied position of parties, the nature of the estate, right, or authority, to be affected. Neither a Bacon nor a Coke nor a Mansfield could accomplish so herculean a task.

By the law of England, which also prevails in most of the states, a right to an easement, as a way, a water privilege, use of light, &c., may be acquired by an uninterrupted enjoyment for twenty years. The old authorities, indeed, treated the question as one of presumption merely, to be determined as a question of fact by the jury. They admitted proof, of course, that the fact was not in accordance with the presumption. Practically, and by degrees, it assumed the force, if not the form, of a legal conclusion; and, as remarked by Ch. Kent,—3 Kent 445,—the latest English authorities make this presumption one *juris et de jure*, having all the stability and force of a formal grant. It has long been so considered in this state. This is a practical common sense view of the subject, which can alone secure the full advantages of the principle. In this state in analogy to our limitation act in respect to real estate, the time is reduced to fifteen years,—especially in reference to all rights, interests, or privileges, having even the remotest connection with the realty. *Holcroft* v. *Heel*, 1 B. & P. 400. *Campell* v. *Wilson*, 3 East 294. *White* v. *Palmer*, 4 Mass. 149. *Brown* v. *Wood*, 17 Mass. 68. 14 Mass. 49. 4 Mason 397. Many authorities, English and Amer-

ican, are referred to in notes to 3 Kent 444. *Hurlbut* v. *Leonard,* Brayt. 201. *Mitchell* v. *Walker,* 2 Aik. 266. *Shumway* v. *Simons,* 1 Vt. 56. *Bullen* v. *Runnels,* 2 N. H. 255.

There is scarcely any fact, or right, which may not be affected by presumption. The right of a corporation to take toll on sale of corn in market was presumed from forty years practice. *Hill* v. *Smith,* 10 East 476. Although in England the statutes of limitations are held not to interrupt the rights of the crown, yet a grant from it may be presumed, even within the time of legal memory. *Mayor of Kingston upon Hull,* v. *Horner,* Cowp. 102. Ld. Mansfield said, in *Eldridge* v. *Knott,* Cowp. 215, on the authority of Ld. Coke, that an Act of Parliament may be presumed. Banking, turnpike and other corporations may be shewn to exist by presumption. *State* v. *Carr,* 5 N. H. 367. *Panton Turnpike Co.* v. *Bishop,* 11 Vt. 198.

The subdivision of towns into school districts and highway districts, and the organization of the former, with its officers and powers, may be shewn by usage and acquiescence. *Sherwin* v. *Bugbee,* 16 Vt. 443. *Dillingham* v. *Snow,* 5 Mass. 547. 11 Vt. 609. *Barnes* v. *Barnes,* 6 Vt. 393. A division of lands held in common into several lots is a proceeding specially provided for by statute, wherein is pointed out in detail the steps necessary to be taken. Yet it is much oftener proved by reputation, or acquiesence, than in any other way. Rarely, indeed, is a strictly statutory division shown in our courts.

But it is unnecessary to adduce other examples, which might be greatly extended, in order to evince the extensive application of the principle alluded to. That as cogent and weighty reasons exist in favor of its application to the subject of jail yard limits, as to most of those already mentioned, cannot be doubted. We are all satisfied, there is no substantial ground for making it an exception. It should rather appear, that a less amount of testimony would be requisite here, than in most other cases. Ordinarily the estate, right, or authority, is sought to be established directly in opposition to the admitted rights of others. In such cases, undoubtedly, a more severe and rigid rule ought to be adopted,— uninterrupted use for the requisite period, or unequivocal acquiesence.

When, however, the question arises collaterally, where no direct,

permanent antagonism exists between the parties upon the point involved, and, above all, when the fact, to which the presumption is applied, is one mutually taken for granted in the transactions out of which the controversy arises, then the lowest amount of evidence suffices to establish it. Is this not a case of the latter description? A contract is entered into, growing out of the relation of creditor and debtor, sanctioned by law, by which the latter agrees to remain within certain circumscribed limits, until the debt is paid, or until authorized by law to depart therefrom. So far both parties assume, as an admitted fact, the existence of a territorial area, in reference to which such a contract may be legally made, a violation of which, on the part of the debtor, subjects him and his sureties to damages to the amount of the debt. True, this contract does not carry, on the face of it, a correct description of the territory. Neither may have any personal knowledge of the actual boundaries; both suppose them to be fixed by law, and susceptible of ascertainment. Both may be mistaken as to the fact of the existence of any such recognized area;—and what would be the result; why most clearly, as already stated, that the contract would fall to the ground for the want of any legal basis on which to rest. But here a somewhat different case occurs; no controversy exists as to the existence of the territory; but a dispute arises as to the exact boundaries of it, and that dispute involves the question, whether the contract has been broken, or not.

How is such a dispute to be adjusted? Not, certainly, by refering to any express clause in the contract, nor yet to any supposed intention of the parties. If capable of ascertainment by a resort to the records of the county court, as is ordinarily the case, then such resort must be had. If not, proof of general understanding and acquiescence of all concerned for thirty years, probably for fifteen, in certain recognized and well defined boundaries is equivalent to record proof. If the intention of the parties were of any consequence in this respect, it might well be presumed, they had reference to the same line of demarcation, which all others recognized and acted upon. 1 Vt. 181.

A case has been mentioned at the bar, decided in this court, in 1832, in Chittenden county, but not reported, which not only affords a direct authority for the decision we now make, but goes much be-

yond it. The name of the case was *Prince* v. *Burnham et al.* I have been obligingly furnished with a short note of it, by HUTCHINSON, late Chief Justice, who was present when the decision was made. In that case it appeared that the jail limits were regularly laid out and established by the county court, and some rods exterior to one of the lines a pine tree stood, marked plainly with the letters G. L., indicating that it was on the line of the gaol limits ;—but by whom these letters were cut, or when done, did not appear, although it was less than thirty years, but more than fifteen, before the alleged escape; and it appeared, that, from the time it was thus marked, the prisoners upon the limits had been accustomed to go to that tree, and treat it as one of the corners of the jail limits. A visit to this tree, by a prisoner on the limits, was decided not to be a breach of the jail bond. Here the liberties, as defined by record, were actually enlarged by usage to a considerable extent, so as, perhaps, to include more than four square miles, and in some form on that side, I should think, not easily susceptible of ascertainment. It is proper to add, that the court was not unanimous in that decision.

On the whole the judgment of the county court is affirmed.