HOWLAND (BUCHANAN v.). See Case No. 2,074.

## Case No. 6,793.

### HOWLAND v. CONWAY.

[Abb. Adm. 281.] [1]

District Court, S. D. New York. May, 1848.

SEAMEN—SUITS FOR REDRESS — PROBABLE CAUSE —IMPOSITION OF COSTS—WITNESS—IMPEACHMENT OF TESTIMONY.

1. It is the course of admiralty courts not to impose costs upon seamen when they establish probable cause for instituting suits for redress.

2. The practice formerly prevailing in this court and in the circuit court, allowing the impeachment of a witness by proof of declarations made by him out of court, contradictory to his testimony, without requiring that he should be first examined with respect to them,—commended.

3. The rule more recently introduced into the English practice, and adopted in many of the state courts of the United States, which prohibits the impeaching of a witness by proving declarations of his contradictory to his testimony, unless he has been previously questioned in respect to such declarations, and afforded the opportunity to explain them,—disapproved.

But see note at the end of this case, on the rule laid down by the supreme court of the United States, in Conrad v. Griffey, 16 How. [57 U. S.] 38.

[1] [Reported by Abbott Brothers.]

This was a libel in personam, by Daniel Howland, one of the crew of the ship Elisha Denniston, against Andrew Conway, master of the vessel, to recover extra wages, by way of damages for being put on short allowance. There were two other suits against the same respondent, brought by B. M. Travers and Henry Ware respectively, also members of the same crew. All three suits arose out of the same facts, and the other two were, by stipulation, made to abide the event of this. The facts in proof bearing upon the libellant's claim are fully stated in the opinion. The principal question discussed, however, related to the propriety of impeaching a witness by proof of declarations made by him out of court, inconsistent with his testimony, without first calling the attention of the witness on cross-examination to the alleged discrepancy, and giving him an opportunity to explain. The facts on which this question arose were as follows: The libellants, to prove their case, read in evidence depositions of several of the crew, who testified that the bread served out to the crew on the voyage in question was wormy, dusty, filled with cobwebs, and not suitable or wholesome for food. To meet this testimony, the respondent introduced a witness, who testified that he was a custom-house officer, and had charge of the ship on her arrival at this port from the voyage; that he saw the several members of the crew ,whose depositions were read on behalf of the libellant at the time when they were paid off; that he heard them make statements in reply to questions asked them by the captain, to the effect that the bread supplied to the crew on the voyage was good. This testimony was relied on by the respondent as impeaching the credibility of the depositions. For the libellant it was contended that evidence of these contradictory statements out of court should not be regarded unless the witness sought to be impeached was, upon his examination, questioned as to his prior statements, and allowed an opportunity to explain.

C. Donohue, for libellant.
W. R. Beebe, for respondent.

BETTS, District Judge. This was one of three suits brought by several of the crew of the ship Elisha Denniston against her master, for short allowance of bread on a voyage from New York to New Orleans, Mobile, Liverpool, and back to New York. The gravamen of the action is that the bread was wormy, dusty, and filled with cobwebs, and was not suitable or wholesome for food.

Two of the libellants and four others of the crew, all being colored men, and examined upon deposition, testified strongly to the badness of the bread, and their statements support the allegations of the libel. It is, however, proved by the custom-house officer, who had charge of the ship on her

return to this port, that these latter four seamen distinctly declared that the bread supplied to the crew on the voyage was good, and that there was no ground of complaint in regard to it. The bread which was left over of the ship's stores after the voyage was ended, was carefully examined by bakers in this port, and they found it to be then sound and good, equal to the best quality of bread, except pilot bread, furnished to merchant vessels at this port, and to be greatly superior to that supplied to English vessels in English ports. These facts, if considered in connection with the testimony showing statements made by the witnesses for the libellants in contradiction of their testimony, displace all foundation for any claim for wages by way of damages for short allowance. For it appears that the ship had an ample supply of suitable bread on board; twelve or fourteen barrels were taken from her after the voyage ended, and the quality is proved to have been then marketable and fair.

The libel must accordingly be dismissed on the demand for damages on the ground of short allowance; and as the other two suits were to depend on the decision of this, the same decree must be entered in them also.

The other question raised, whether the wages due to the libellants under the shipping agreement have been fully paid or not, is not properly before me upon this hearing.

The only point really requiring any consideration is the award of costs to be made. I consider that a color for the claim of extra wages is afforded, as it appears that the master ordered the bread to be baked over at Liverpool. This, as the evidence on the part of the master himself shows, is the usual course in case bread is wormy or mouldy; and it is reasonably to be inferred that the expense and trouble of rebaking the bread would not have been incurred in this regard, if it had been, during the whole voyage, pure and wholesome. It is shown in the proofs that the best and finest bread will occasionally breed worms, and require purifying by rebaking. As the ship had an abundant supply of bread, the officers ought to have taken pains to select that which was not so affected, and to have avoided serving out vitiated provisions. It is sufficiently evident, upon the whole case, although the important points in the charges and proofs of the libellants are refuted and discredited, that the complaint is not wholly groundless or malicious; for, in addition to these facts, several of the men swear that the mate was told the state of the bread, and that it was shown to him, yet his evidence is not put in by the respondent. It may be that the wormy bread was given out from inattention; but it was the master's duty to see that none but fresh provisions were used. The course of admiralty courts is not to charge costs upon sailors when they establish probable cause for instituting suits for redress; and I shall accordingly award no costs against them in these cases.

And if the witnesses not interested in the suits were, upon sound and safe principles of law, entitled to credit in these cases, I should allow the libellants summary costs against the master, upon the ground that although technically he could not be held chargeable for short allowance, yet his conduct in permitting bad bread to be given out to the men should be regarded as blameable and wrongful.

But deliberate declarations of these witnesses, made in direct conflict with their testimony, are proved against them; and their evidence, under such circumstances, will not, in law, justify a judgment in conformity to it, unless it be corroborated and supported by other proofs.

It was insisted that this evidence of contradictory declarations of the witnesses was to be disregarded, because the witnesses were not previously cross-examined in reference to such statements. And this view is sustained by the rule of evidence on this point, laid down in the Queen's Case, 2 Brod. & B. 315, 6 E. C. L. 149. In that case, certain questions of evidence arising out of the proceedings against Queen Caroline, were put to the judges of England by the house of lords. One of those questions was, whether, according to the practice and usage of the courts below, and according to law, when a witness in support of a prosecution has been examined in chief, and has not been asked in cross-examination as to any declarations made by him, . . . . it would be competent to the party accused to examine witnesses in his defence to prove such declarations, without first calling back such witness examined in chief, to be examined or cross-examined as to the fact whether he ever made such declarations? The judges were unanimously of opinion that, "according to the usage and practice of the courts below, and according to law as administered in those courts, the proposed proof cannot be adduced without a previous cross-examination of the witness as to the matter thereof." Chief Justice Abbott, in delivering the opinion of the judges, speaks as follows: "The legitimate object of the proposed proof is to discredit the witness. Now, the usual practice of the courts below, and a practice to which we are not aware of any exception, is this: if it be intended to bring the credit of a witness into question, by proof of any thing he may have said or declared touching the cause, the witness is first asked upon cross-examination, whether or no he has said or declared that which is intended to be proved. If the witness admits the words or declarations imputed to him, the proof on the other side becomes unnecessary, and the witness has an opportunity of giving such reason, explanation, or exculpation of his conduct, if any

there be, as the particular circumstances of the transaction may happen to furnish; and thus the whole matter is brought before the court at once, which, in our opinion, is the most convenient course. If the witness denies the words or declarations imputed to him, the adverse party has an opportunity afterward of contending that the matter of the declaration or speech is such, that he is not to be bound by the answer of the witness, but may contradict and falsify it; and if it be found to be such, his proof in contradiction will be received at the proper season. If the witness declines to gives any answer to the question proposed to him, by reason of the tendency thereof to criminate himself, and the court is of opinion that he cannot be compelled to answer, the adverse party has, in this instance, also, his subsequent opportunity of the matter which is received, if by law it ought to be received. But the possibility that the witness may decline to answer the question affords no sufficient reason for not giving him the opportunity of answering, and of offering such explanatory or exculpatory matter as I have before alluded to; and it is, in our opinion, of great importance that this opportunity should be thus afforded, not only for the purpose already mentioned, but because, if not given in the first instance, it may be wholly lost; for a witness who has been examined, and has no reason to suppose his further attendance requisite, often departs the court, and may not be found or brought back till the trial be at an end. So that if evidence of this sort could be adduced on the sudden and by surprise, without any previous intimation to the witness, or to the party producing him, great injustice might be done, and in our opinion might not unfrequently be done both to the witness and to the party; and this not only in the case of a witness called by a plaintiff or prosecutor, but equally so in the case of a witness called by a defendant; and one of the great objects in the course of proceeding established in our courts is the prevention of surprise, as far as practicable, upon any person who may appear therein."

The same rule was laid down on the authority of the Queen's Case [supra]; but with greater precision in Angus v. Smith, Mood. & M. 473, 22 E. C. L. 567. Chief Justice Tindal there says: "I understand the rule to be, that before you can contradict a witness by showing he has at some other time said something inconsistent with his present evidence, you must ask him as to the time, place, and person involved in the supposed contradiction. It is not enough to ask him the general question, whether he has ever said so and so, because it may frequently happen that upon the general question he may not remember having so said; whereas, when his attention is challenged to particular circumstances and occasions, he may recollect and explain what he has formerly said."

I am aware that since the decision of the Queen's Case, many of the state courts in this country have adopted the practice thus indicated.[2]

Thus in Kimball v. Davis, 19 Wend. 438, the supreme court of the state of New York follows the ruling of the Queen's Case and of Angus v. Smith, applying it to the special case of a witness examined upon commission by interrogatories and cross-interrogatories, whose deposition was sought to be impeached by proof of counter statements made by the witness out of court. And the court answer the objection raised, that in the case of depositions taken under a commisssion there is no opportunity to call the attention of the witness to the inconsistent declarations, by remarking that there is no reason for a distinction between this and the case where the discovery of the evidence occurred after the cross-examination was ended, and the witness had left court and could not be brought back—a case which all the judges in the Queen's Case refused to make an exception;—and by the further suggestion that there is an additional reason for the appli-

[2] The rule in the Queen's case is still followed in England. Macdonnell v. Evans, 10 Eng. Law & Eq. 484. For the course of American decisions on the subject, consult Tucker v. Welsh, 17 Mass. 160; Brown v. Bellows, 4 Pick. 188; People v. Moore, 15 Wend. 419; U. S. v. Dickinson [Case No. 14,958]; Everson v. Carpenter, 17 Wend. 419; Franklin Bank v. Pennsylvania, D. & M. Steam Nav. Co., 11 Gill. & J. 28; Able v. Shields, 7 Mo. 120; Doe v. Reagan, 5 Blackf. 217; M'Intire v. Young, 6 Blackf. 496; State v. Marler, 2 Ala. 43; Weaver v. Traylor, 5 Ala. 564; Goode v. Linecum, 1 How. (Miss.) 281; Garrett v. State, 6 Mo. 1; McAteer v. McMullen, 2 Pa. St. 32; Kay v. Fredrigal, 3 Pa. St. 221; Sharp v. Emmet, 5 Whart. 288; Sealy v. State, 1 Kelly, 213; Regnier v. Cabot, 2 Gilman, 34; Downer v. Dana, 19 Vt. 338; Palmer v. Haight, 2 Barb. 210; Story v. Saunders, 8 Humph. 663; Howell v. Reynolds, 12 Ala. 128; Clapp v. Wilson, 5 Denio, 285; Wilkins v. Babbershall, 32 Me. 184; Williams v. Turner, 7 Ga. 348; Johnson v. Kinsey, Id. 428; Williams v. Chapman, Id. 467; Moore v. Bettis, 11 Humph. 67; Clementine v. State, 14 Mo. 112; King v. Wicks, 20 Ohio, 87; Sprague v. Cadwell, 12 Barb. 516; Carlisle v. Hunley, 15 Ala. 623; Nelson v. Iverson, 17 Ala. 216; Armstrong v. Huffstutler, 19 Ala. 51; Powell v. State, Id. 577; Titus v. Ash, 4 Fost. [N. H.] 319; Hedge v. Clapp, 22 Conn. 262; Bryan v. Walton, 14 Ga. 185; Smith v. People, 2 Mich. 415; Wright v. Hicks, 15 Ga. 160; Wiggins v. Holman, 5 Ind. 503; Patchin v. Astor Mut. Ins. Co., 3 Kern [13 N. Y.] 268; Ware v. Ware, 8 Greenl. 42. From these cases it would appear that the rule of the Queen's Case has been adopted in the states of New York, Alabama, Georgia, Ohio, Michigan, Maryland, Missouri, Indiana, Illinois, and Tennessee; having, also, been expressly applied to the case of depositions, in New York, Alabama, Georgia, and Tennessee. That it has been disavowed in Massachusetts, Maine, New Hampshire, Connecticut, and Pennsylvania. That it has been adopted in Vermont; but with the exception that it is there held to be inapplicable to the case of depositions, whether taken with or without notice, and whether or not the adverse party attended at the taking or not. In case of deposition, the adverse party may, without previous inquiry, prove any inconsistent declarations or conduct of the witness. Downer v. Dana, 19 Vt. 338.

cation of the rule in the case of depositions, as otherwise a strong temptation would exist to tamper with witnesses to pervert or manufacture conversations ·after the execution of the commission, and when explanation would be impossible. Id. 441.

So, also, Mr. Justice McLean, in the U. S. circuit court, adopts the same rule of evidence as the one prevailing in Ohio, and as therefore obligatory upon the courts of the United States sitting within that state. McKinney v. Neill [Case No. 8,865]. But it would seem to be the usage of the court upon that circuit to regard the practice of the local courts as governing that of the federal courts there held. And see remarks · of Story, J., in Beers v. Haughton, 9 Pet. [34 U. S.] 362.

The circuit court in this district, however, upon mature consideration, declined to adopt the rule of the Queen's Case, considering the subject to be merely matter of practice resting in the discretion of the several courts. It was so treated by the judges who assigned their reasons, in the house of lords, for the rule. The argument in its support was not based on common-law principles of evidence. This view of the subject seemed to us also to be consonant to authority. Phil. Ev. c. 8, 230; 2 Cow. & H. notes, 773; Tucker v. Welsh, 17 Mass. 166. We regarded the rule which we considered to have prevailed in England and in this state, prior to the Queen's Case, to be recommended by considerations of higher weight than those adduced in support of the rule declared in the Queen's Case; but which was not directly sanctioned by the New York supreme court, previous to 1838. It is clear, from the decision in 1836 (People v. Moore, 15 Wend. 419), that at the date of that decision, the courts of this state had not adopted the rule of the Queen's Case, which had been promulgated as early as 1820; nor was that rule observed in the early practice of the English courts. 1 Phil. Ev. (Ed. 1820) 212; Peake, Ev. 89; 1 Starkie, Ev. (1st Ed.) 1451; 2 Esp. 601; Hawk. P. C. bk. 2, c. 46, § 14; 1 McNally, Ev. 378. Nor had it prevailed, at least to any great extent, either among the courts of the several states of the United States, anterior to the Queen's Case,—1 Hayw. (N. C.) 437; Tucker v. Welsh, 17 Mass. 166; 4 Pick. 441; 1 Serg. & R. 526; 2 Esp. N. P. (Ed. 1811) 540; Baker v. Arnold, 3 Caines, 279; People v. Vane, 12 Wend. 79; 8 Greenl. 42,—or among the courts of the United States,—Lamalere v. Caze [Case No. 8,003]; U. S. v. Thompson [Id. 16,487]; Wright v. Deklyne [Id. 18,076]. We discerned nothing in the reasons governing the Queen's Case to induce us to change the practice heretofore adopted in the circuit court and in this court, to conform to that decision. It seemed to us that the more sound and consistent course was to require the party whose witness was impeached by proof of his contradictory statements, to assume the burden of producing the witness again to explain his own declarations. The case of Judson v. Blanchard, 4 Conn. 557, is an authority allowing that to be done. The testimony of the witness in court may be the occasion of recalling to the memory of others what he had said elsewhere; and thus contradictory statements may often, as we considered, come, for the first time, to the knowledge of the party interested to produce them, after the examination and the cross-examination of the witnesses had closed, and very probably after he was out of the recall of such party, and thus even life be saved against the testimony of unscrupulous and perverse witnesses.

These considerations, with others, satisfied the court that the old and familiar practice in this respect was to be preferred to that established by the Queen's Case, as a means for unmasking fictitious evidence, and protecting property, life, and character exposed to peril by the oaths of reckless witnesses. This rule is more emphatically important in respect to evidence given under commissions or by deposition, than to that given orally in open court. We accordingly have held that the credibility of a witness may be impeached by proving his declarations made out of court, and contradictory to his testimony, without a previous examination.[3]

I am accordingly of opinion that the depositions offered by the libellants, in support of their libel, may be impugned by evidence of the contradictory declarations made by the witness not on oath, and that upon the whole evidence the equity preponderates in favor of the respondent, upon the question of his liability to the libellants for costs. The libel must therefore be dismissed, without costs, unless, upon the report of the commissioner, a balance of wages earned under the shipping articles shall be found due to the libellants. Decree accordingly.

HOWLAND (DE WOLF v.). See Case No. 3,852.

HOWLAND (DONAHAY v.). See Case No. 3,978.

HOWLAND (EMERSON v.). See Case No. 4,441.

HOWLAND (FRATES v.). See Case No. 5,066.

[3] The rule laid down in the text, prevailed in both the circuit and district courts in this district, until the decision of the supreme court of the United States, in Conrad v. Griffey, 16 How. [57 U. S.] 38, decided in 1853. In that case it was held, Mr. Justice McLean delivering the opinion of the court, that the rule of the Queen's Case is a salutary one, and should be followed in the courts of the United States. That rule has, therefore, now become the law governing the practice of the United States courts in this district; but it was thought proper to preserve the history and reasons of the change therein, established in 1853.