Morgan, J.
Appellee recovered a judgment, on a verdict, for $2,000. in the Jefferson county district court, May 26, 1909, on account of an alleged wound on the front part of her leg, between the knee and the ankle, which she claimed to have received while bathing in one of appellants’ bath tubs in their public bath house at Idaho -Springs, in this state, and caused, as she alleges, by appellants ’ negligence in permitting a rough-edged piece of copper, covered with dirt and verdigris, to protrude from the lining of the tub in such way as to inflict the wound, which she alleges resulted in blood poisoning and the consequent injury complained of.
An examination of this appeal presents three predesignate issues of fact necessary to a logical discussion and determination of the legal issues involved: (1) Was the appellee injured as she alleged; (2) Was appellants’ negligence the cause thereof? (3) Was the alleged damage the result? These three issues were determined by the jury in favor of the appellee, but such determination was, doubtless, the result of errors of law that occurred at the trial, manifestly and materially affecting appellants’ substantial rights, as that term is construed by *532 the courts of other states as well as our own. Our code provides that:
“The court shall in every stage of an action disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect; * * * Any error, defect or abuse of discretion manifestly and materially affecting the substantial rights of any party to the action may be received and corrected by the supreme court on appeal or writ of error, whether occurring before, at or after the final judgment.” — Sec. 78, Mills’ Ann. Code.
It is not so difficult to ascertain that there was error in the proceedings, as to determine whether such error manifestly and materially affected the substantial rights of the appellants.
The case was tried three times, resulting in two verdicts for appellee, and one disagreement. On the last trial, certain testimony was read to the jury that had been given by a witness at a former trial and transcribed by the stenographer who took it down; and the testimony of two witnesses was rejected, tending to prove that the testimony so admitted and read was obtained by offering to give the witness an interest in whatever judgment was obtained. The testimony so admitted, and that which was rejected, bore materially upon the first two, and indirectly upon the third, of the aforesaid issues of fact. The rule is quite generally established, even in the absence of a statute, that the testimony of a witness at a former trial, transcribed by the court stenographer and reporter who took it down, may be proved in a subsequent trial between the same parties and involving the same issues, by introducing such report thereof; provided that the witness is dead, insane, beyond the jurisdiction of the court, or is sick and unable to testify, or cannot be found after diligent search, or appears to have *533 been kept away by the adverse party. — 1 Greenleaf on Ev., 234. But, as stated in Emerson v. Burnett, 11 Colo. App., 86, 90:
“The courts all agree that conditions may exist which would authorize the introduction of the former testimony of an absent witness, but they disagree as to the character of the conditions; and while some hold that the fact that he is out of the jurisdiction is enough, it is the doctrine of others that the party desiring his testimony must first use due diligence to procure his deposition. ’ ’
The question here is concerning the diligence used, to procure the attendance of the witness, as it was admitted that the evidence, transcribed, was correct in all respects, and no question arose as to taking her deposition. Such testimony is the best proof obtainable as to what a witness swore to on a former trial, but not so good in all respects as a deposition, as the witness whose deposition is taken, either reads, or has the deposition read over to him, before he signs the same, and an opportunity is then given to correct any errors in taking it down or transcribing it. The sufficiency of the showing to excuse the absence of the witness and to admit the offered testimony is largely within the discretion of the court, and it is only upon an abuse of such discretion that the appellate courts will interfere. The diligence shown by the record here is that the witness, after she gave her testimony on the former trial, went to an adjoining county, and from there to another county, in this state; that appellee wrote to her, prior to a former trial, and received a letter from her while she was in the latter place, and answered it, but received no reply; that appellee asked her attorney to cause a search to be made for the witness, but the attorney m.erely had a subpoena issued, in the name the witness bore when she testified, and delivered it to the sheriff of Jefferson county, and no re *534 turn was made thereupon; that appellee had never heard of the witness’ being in any other place in the state, and that she inquired of the postmaster at the place where she wrote as above stated; it appeared also that the witness had married since her testimony was given, and was thereafter known by a different name. The court, .in ruling upon the objection interposed to the insufficiency of this showing, said:
“The Court: It appears that this witness has testified that after making some search she was unable to find this party in this county, that she in all probability is not in the county. I will overrule the objection.”
This ruling discloses a mistaken idea of what is required. The county is not the limit of the jurisdiction of the district court. A subpoena issued in the name the witness bore at the time, and directed to the sheriff of the county in which she lived when last heard from might have reached the witness, so far as anything definite can be determined from the record. The admission of this testimony materially affected the substantial rights of the appellants, and the showing made to excuse her absence was insufficient.—5 Enc. of Ev., 396, 964; 1 Greenleaf on Ev., 234; Sou. Ry. Co. v. Bonner, 141 Ala., 517, 37 Sou. 702; Wabash Ry. Co. v. Miller, 158 Ind., 174, 61 N. E., 1005; Reynolds v. Fitzpatrick, 28 Mont., 179, 72 Pac., 510. We might not disturb the conclusion of the lower court, reached, within its discretion, that the showing was sufficient, were it not for the peculiar circumstances of this ease in reference to the impeaching testimony rejected, and the consequent importance of the presence of the absent witness, in order that she might be cross-examined and a foundation laid for the introduction of the impeaching testimony.
The testimony of the two witnesses, that was offered and rejected, tended to prove that the witness, whose former testimony was admitted, stated, prior to the date *535 of her testimony at the former trial, that the appellee promised to give her $300 for testifying, if she won the suit. The testimony of the absent witness was that she saw the appellee in the bath tub after the wound had been inflicted, examined the protruding piece of copper on the bath tub, and, later, saw the swollen and inflamed condition of the appellee’s leg. This was the only testimony, aside from the testimony of the appellee, tending to prove that the wound was inflicted as,alleged. But if her testimony was obtained wholly, or partly, by reason of an agreement between her and the appellee, that she was to receive part of whatever might be recovered, her testimony would have less weight, and the testimony of appellee would be materially affected by the damaging consequences of such an agreement. The only objection made to the introduction of the impeaching testimony was that it was incompetent, irrelevant and immaterial, and for the reason that no ground for impeachment had been laid. It appeared, furthermore, that the impeaching testimony was not ascertained until after the trial at which the absent witness testified. There is no doubt . that the evidence, offered, impeaching the former witness on account of bias, interest and corruption, was competent, material and relevant, but its admissibility, without first having laid a foundation for it, is extremely questionable under the authorities. It could hardly be c'onsidered substantive evidence, but was in relation to an extrinsic matter impeaching the former witness on account of interest, bias or corruption. Extrinsic evidence such as this may always be admitted to prove the bias, interest or corruption of a former witness. Wigmore on Ev., sections 948, 956, 966; Phoenix Ins. Co. v. LaPointe, 118 Ill., 387. The great weight of authority, however, on the question that a foundation must first be laid for all testimony of an impeaching character, is to the effect that some question must be asked, on cross- *536 examination of the witness to be impeached, concerning the testimony to be offered of an impeaching character, so that the witness may have an opportunity to admit, deny, or explain such impeaching testimony.—1 Green-leaf on Ev. (4th ed.), sec. 462; 3 Jones on Ev., sec. 848; Ryan v. The People, 21 Colo., 119; Lerum v. Geving, 97 Minn., 269, 105 N. W., 967, 969. However, under the conditions here,- and leaning toward the position taken in several authorities, founded upon very good reasoning, that a foundation is not necessary in all cases, especially where the testimony offered is wholly for the purpose of showing bias, interest or corruption, and where the witness to be .impeached is absent from the jurisdiction of the court, or has not testified at the trial, but whose deposition or former testimony is being used, and the knowledge of the impeaching testimony was obtained after the former testimony was given, we conclude that the strict rule in regard to laying a foundation for impeaching testimony ought not to be applied. Mr. Wig-more, in-his work on Evidence, says, in stating the objections to the rule:
"The objection in brief is that in many eases it is impossible for the impeaching party to ask the question while the witness is on the stand, because it is often not until after the testimony is delivered that the prior contradictions are brought to the opponent’s notice, and thus, wherever the witness becomes unavailable by death or absence, the contradictions cannot be used.”—2 Wigmore on Ev., sec. 1027. Citing Downer v. Dana, 19 Vt., 345; Hedge v. Clapp, 22 Conn., 266.
He further says, in the same section that:
"A due consideration * * '* leads to the conclusion that in general the preliminary question should indeed be put, before producing the alleged contradiction, but that this requirement, instead of being rigid and in *537 variable, should be open to exceptions, and should be dispensed with, in the court’s discretion, where the putting of the question has become impossible and the impeaching party has acted in good faith. This sensible form of the rule is, however, in vogue in a few jurisdictions only. The modern tendency has been to enforce the rule with inconsiderate and arbitrary rigidity. Today it does, upon the whole, as much evil as good, and it is to be hoped that a reaction will some day manifest itself.”
Our supreme court and the former court of appeals have followed the majority of the authorities, and have enforced the rule with considerable rigidity, but usually in criminal cases, and not in any case whpre like circumstances have existed, such as appear in the case at bar.—Ryan v. The People, supra.
It seems to us that, if it is intended to impeach the testimony by showing the witness has made statements out of court directly in conflict with those made in court, then, and in such cases as that, a foundation should be laid on cross-examination so as to give the witness an opportunity to either deny, admit, or explain such statements made out of court; but where the object is, as the object was in this case, to show corruption and interest in the judgment to be obtained, that no foundation is really necessary. It is concluded, therefore, that it was reversible error to admit the former testimony to be read, without also admitting the impeaching testimony.
Appellants’ contention that all evidence concerning the general condition of the bath tubs was prejudicial, and its admission reversible error, is not good, because, while it was very general in its character, and in several instances beyond the issues, yet it would tend to prove a condition of things indicating negligence on the part of appellants in the care given by them in keeping the bath house and the bath tubs in a clean and sanitary condition. It tended to prove that they made no examina *538 tion of the tubs sufficient to discover any defect that might exist.
As to the question concerning the agency of the boy who took the appellee’s money and showed her the bath tub the proof was sufficient in this regard to establish the liability of the appellants. If the injury was caused by the defective condition of the bath tub through the owners’ negligence, it is immaterial whether the person in charge was a servant of the owners of not, where the injured person pays for the bath, if it is a person in charge who receives the money and waits upon the customers, as there is nothing here to raise the presumption or give any notice that the baths were not under the owners ’ control.—Haugh v. Chicago, etc., R. R. Co., 73 Ia., 66, 35 N. W., 116.
The lower court committed no error in excluding the testimony of the witness, and a demo'nstration offered to be made by him in a bath tub for the purpose of showing that it was impossible for a person to receive a scratch -in the fore part of the leg between the knee and the ankle from a defect such as is alleged to have existed in this case. There was no proof that the tub was exactly sim ilar, nor that the leg of the witness was sufficiently the same form as that involved in the facts of the case.
In addition to the error hereinbefore considered in regard to the testimony, there was error worthy of serious consideration concerning the proof by which the appellee sought to establish that the alleged damage was the result of the injury which she' claims to have received; especially as to whether such proof followed the allegations of the complaint, that blood poisoning ensued by reason of the wound.
The testimony of the appellee was, that her leg was slightly scratched, and that she did not discover the place - on the tub where she scratched it until she caught the *539 towel on the jagged place which she testified was found in the tub. If it had been anything more than a slight wound, she would certainly have been aware of its infliction at the moment she received it, and would necessarily have examined the tub at that time to ascertain what it was that wounded her. It must be concluded that it gave her no pain at all until at least a few moments after it had been inflicted. Therefore, she ought to be required to prove quite distinctly that her damage was the result of the wound, and she ought to be confined to the allegations in her complaint concerning blood poisoning, which it was distinctly alleged was the direct result of the wound. The record shows that she was the only witness who testified that the wound produced the diseased condition of her limbs. Her husband and her mother were the only witnesses who testified that blood poisoning resulted, and even their testimony on this issue was incidentally, rather than directly, drawn out, and neither testified as to any knowledge or experience whatsoever on the subject; notwithstanding an objection interposed to the husband’s testimony for this particular reason. All the husband said was: “She injured her right limb in the bath tub, cut it on the protruding piece' of lining, and blood poisoning set in.” All the mother said on cross-examination was: “I told Mr. N. C. Merrill in April, 1905, that when my daughter, Mrs. Stock, came to visit me in March, 1904 (at least three months after the alleged injury), that I saw her limbs and that both of her legs at that time were broken out with red sores and that the right leg from the knee down was red and sore and worse than the left leg. I am the plaintiff’s mother. They were not cancre (so spelled in the record) sores on her limbs, but it seemed to me that the injury which she had received on her right leg produced blood poisoning.” It seems that no effort was made to prove this allegation of the complaint. The complaint alleged: -
*540 “Ninth. That the wound caused by said tear in the said bath tub was not regarded by this plaintiff as a serious matter at the time of the said occurrence, but within twenty-four hours thereafter this plaintiff’s limb became somewhat swollen and discolored, and the said swelling and discoloration continued to increase until this plaintiff was forced to take to her bed because of the pain and agony suffered by her on account of said swelling and discoloration; that by reason thereof blood poisoning set in which confined this plaintiff to her bed for six weeks absolutely, and for a period of about four months altogether, during which time she was attended by a physician and was obliged to and did take nauseating, vile medicines to overcome the said condition of blood poisoning which had ensued by reason of the said wound received in the said bath tub.
“Tenth. That since said period of time this plaintiff has suffered great and immeasurable distress, anxiety and pain on account of the said blood poisoning, and her health has been permanently injured and shattered. Her limb'has been practically ruined and is now, and has been since shortly after the said injury, a blackened, distorted and diseased mass, from which, as this plaintiff is informed and believes, she will never wholly recover.
“Eleventh. That the said defendants, * * * * were and are responsible to this plaintiff by reason of their negligence which resulted in said injury to this plaintiff. That said negligence consisted in each and every of the following particulars, to-wit:
“(a) In allowing said bath tub to become and remain in a dangerous condition while being rented to this plaintiff for the purpose of taking a bath, on account of the tear in the side of the copper composing the lining of said bath tub.
“(b) In permitting said tear to become contaminated and foul with dirt and verdigris at the time the *541 said tub was rented to this plaintiff for the purpose of taking a bath.
“(c) In allowing said tub to become and remain in a filthy condition, whereby and by reason of which this plaintiff suffered, blood poisoning.
“(d) In employing negligent, unskillful and improper attendants at said time and place, whose lack of action in cleaning said bath tub resulted in the injury to this plaintiff.”
The foregoing are the only allegations concerning the alleged damage that resulted from the injury.
Appellants proved, unequivocally, by three physicians of undisputed qualification ahd integrity, that she did not have blood poisoning at all, but all three diagnosed her malady as eczema of some kind. Appellee produced no evidence on the subject, except that which incidentally fell from the lips of her husband and mother. The appellee was not questioned as to the matter, and never testified concerning it, except, incidentally, that: “The doctor (meaning Dr. Stemen) said it was a clear case of blood poisoning at that time. He said there were no varicose veins there.”
Dr. Stemen testified: “My name is George S. Ste-men. I am a surgeon by profession. I know Sarah A. Stock and I made an examination of her lower limbs. The first time was on the 24th of March, 1904, in my office in the City of Denver. I remember the leg she presented to me at that time for examination, which she claimed was injured, and it was the left leg. There was no blood poisoning present at that time on that leg, and I never stated to Mrs. Stock at that - or any other time that it was a clear case of blood poisoning.”
She alleges in her complaint that her damage resulted from blood poisoning, but she signally fails to carry out these allegations in her testimony or the testimony of her witnesses. Appellee’s malady may. have *542 arisen immediately after lier bath, yet it cannot be concluded from the evidence that it was blood poisoning as alleged in her complaint. It may be that some other disease resulted from the scratch, or that the scratch might have produced eruptions and inflammation that could not be diagnosed as any disease, but she alleges that it was blood poisoning, and that it was by reason thereof that she was damaged, and proof of any other result would be a clear variance from the allegations of the complaint. The only testimony that appellee was affected with blood poisoning was by witnesses who did not qualify as to any knowledge or experience that would entitle them to diagnose her case and arrive at a conclusion as to what her disease was; and while no direct objection was interposed to the mother’s testimony for this reason, it was of not sufficient probative force to merit any; neither spoke as one having knowledge or experience, but rather from general impression, and in an incidental and perfunctory manner. The diagnosis of a malady of this character should be made by a physician, nurse, or other person qualified, by education, experience, or otherwise, .in such matters.
In the case of McGraw v. Kerr, 128 Pac., 870, recently decided by this court, it is held that resort must be had to the opinion of experts to determine whether a surgeon exercises ordinary care and skill in examining a case as well as in applying remedies thereafter, and that the jury must determine such question from the preponderance of expert testimony.
In the case of Jackson v. Burnham, 20 Colo., 532, the court said:
“Thereupon it becomes important,- if not the controlling question in the case, which of these respective authorities was correct (referring to the diagnosis of the malady), since the propriety of defendant’s treatment of the plaintiff depends upon which was the correct diag *543 nosis, and whether the defendant' exercised ordinary care and skill in examining the case, as well as in applying the remedies. To determine this, resort must be had to the opinion of experts, based upon the ultimate facts, as the jury may find them established by the weight of the evidence.”
It is claimed by counsel for appellee that the term “blood poisoning,” as used in the complaint, was used in the commonly accepted meaning of the term, and not in its technical sense, and that if it had been intended to allege blood poisoning in its technical sense, the term “septicaemia” would have been used. If the complaint had even alleged that the blood was poisoned, or that a diseased condition resulted, by reason of which she was damaged, such theory might réceive greater consideration. But there was no effort to follow the allegations of the complaint and to prove blood poisoning of any kind. Nothing was disclosed in the testimony as to this difference, if there be any difference, between the commonly accepted, and the technical, meaning, as the term “blood poisoning” was used in the evidence and discussed by the physicians as a disease, and the court instructed the jury, using the term “blood poisoning” with no explanation as to the term used. The physicians testified that blood poisoning consisted of three kinds, or stages, of the disease, and that appellee was not afflicted with any of them. They examined her many times and at various intervals, from a few weeks after her alleged injury down to the last trial. All of them testified, positively, that it was her left leg that she claimed to have injured, including her own physician whom she called to attend her soon after her bath.
Dr. Finucane testified: ‘ ‘ The small veins were varicose. There was no blood poisoning there. In cases of blood poisoning, after the wound takes infection, the first indication is elevation of temperature, then a chill. The *544 blood vessels become inflamed, the vessels extending up towards tbe thigh will probably be enlarged. The lymphatics will enlarge. The lymphatics are susceptible of enlargment from the infection. After the germs get to work in the sore spot, if you can’t retard the trouble right away, you will have the process that is termed blood poison. The first indication is elevation of temperature and a chill. That is what we call septicaemia, the first stage of blood poisoning. The next stage is pyaemia. We have'three stages of blood poisoning — sepraema, septicaemia and pyaemia.' In a case of blood poisoning they either get well or die in six or eight days. There was no blood poisoning in Mrs. Stock’s case that I could recognize.”
No competent testimony of any kind was introduced to show that appellee had any symptoms of the disease commonly or technically known as blood poisoning, and while there was some testimony tending to prove that the appellee’s injury was immediately succeeded by a diseased condition of her limbs, it was at variance with the allegations, and the theory of the complaint and the court was not justified in so submitting the issues to the jury that the verdict might be predicated upon a finding that blood poisoning ensued, and that by reason thereof the appellee was damaged. This view concerning the proof is not in accord with the view of all of my associates.
The judgment is reversed and remanded, with privilege of amendment of the pleadings as the parties may be advised.

Judgment Reversed.

King, J., concurs. Cunningham, P. J., and Hublbut, J., concur in the result. Bell, J., does not participate.